**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MITSUBISHI ELECTRIC CORPORATION,**

                                  **Plaintiff,**

       vs.                                          **3:15-cv-505**
                                                     **(MAD/DEP)**

**WESTCODE, INC.,**

                                  **Defendant.**
_____

**WESTCODE, INC.,**

                                  **Counter Claimant,**

       vs.

**MITSUBISHI ELECTRIC CORPORATION,**

                                  **Counter Defendant.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

**HANCOCK, ESTABROOK LAW FIRM**    **JOHN G. POWERS, ESQ.**
100 Madison Street - Suite 1500        **ASHLEY D. HAYES, ESQ.**
Syracuse, New York 13221-4976
Attorneys for Defendant/Counter Claimant

**PHILLIPS, CAMPBELL LAW FIRM**    **PATRICK C. CAMPBELL, JR., ESQ.**
314 North Middletown Road
Lima, Pennsylvania 19037
Attorneys for Defendant/Counter Claimant

**JENNER, BLOCK LAW FIRM**          **CATHERINE L. STEEGE, ESQ.**
Clark Street, Chicago Office            **JOEL T. PELZ, ESQ.**
353 North Clark Street                 **TERRENCE J. TRAUX, ESQ.**
Chicago, Illinois 60654
Attorneys for Plaintiff/Counter Defendant

**JENNER, BLOCK LAW FIRM**          **WILLIAM C. PERICAK, ESQ.**
District of Columbia Office
1099 New York Avenue - Suite 900
Washington, DC 20001
Attorneys for Plaintiff/Counter Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On April 27, 2015, Mitsubishi Electric Corporation ("Mitsubishi") commenced the instant action asserting a breach of contract claim against Westcode, Inc. ("Westcode"). *See* Dkt. No. 1. Currently pending before the Court are Mitsubishi's motion for summary judgment and motion to dismiss Westcode's counterclaims, and Westcode's motion for judgment on the pleadings. *See* Dkt. Nos. 30, 43, 47.

## II. BACKGROUND

**A.      Factual Background**

The Court assumes the parties' familiarity with the factual background of this case as detailed in the July 11, 2016 Memorandum-Decision and Order (the "July 11 Order"), *see* Dkt. No. 74, and will restate only a brief overview herein. Any further factual details will be incorporated in the relevant discussion sections below.

In the instant action, Mitsubishi contends that Westcode breached its obligations under a Memorandum of Understanding ("MOU") to pay $10,765,876.86 of the $14,869,967.06 due to Mitsubishi. *See* Dkt. No. 1 at ¶¶ 21-25. Westcode asserts two counterclaims in its answer; first, that it is entitled to an accounting of all items relating to the parties completion of the R142A, R143, R160, and PATH transit projects (collectively the "Projects"), such that any excess payments pursuant to the Joint Venture Agreements ("JVAs") for those Projects or other contractual adjustments would offset what Westcode owes under the MOU. Dkt. No. 38 at ¶¶ 37-63. Second, Westcode contends that Mitsubishi breached the implied covenant of good faith and

fair dealing under the JVAs by failing to conduct itself in a commercially reasonable manner. *Id.* at ¶¶ 64-67.

## III. DISCUSSION

**A.     Westcode's Motion for Judgment on the Pleadings**

*1. Standard of Review*

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). The difference between the two is only that a Rule 12(c) motion is filed after the close of pleadings. *Id.*

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)); *see also Sutton ex rel. Rose v. Wachovia Secs., LLC*, 208 Fed. Appx. 27, 29-30 (2d Cir. 2006) (noting that, on a motion to dismiss, a court may take judicial notice of documents filed in another court).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* FED. R. CIV. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[] complaint must be dismissed[,]" *Id.* at 570.

### *2. Partnership Formation*

Westcode argues that the parties formed an official partnership or a joint venture, as those entities are defined by New York Law, in conducting their business on the Projects and through the express agreements contained in the JVAs. *See* Dkt. No. 47-1 at 11. If the parties formed a partnership or joint venture, then Westcode argues that Mitsubishi's claims are premature as a formal accounting of partnership assets is a prerequisite of one partner suing another at law. *Id.*; *see also Friedman v. Golden Arrow Films, Inc.*, 442 F.2d 1099, 1107 (2d Cir. 1971) ("[A] general principle of partnership law [is] that partners cannot sue each other at law for a breach of a partnership agreement or with reference to partnership affairs before there has been a final accounting of the partnership assets"). The Court will first address whether the parties in this

4

case formed a partnership or joint venture and, if so, whether a formal accounting is a prerequisite to bringing the instant action.

"A partnership is an association of two or more persons to carry on as co-owners a business for profit . . . ." N.Y. P'SHIP L. § 10. "A joint venture is a '"special combination of two or more persons where in some specific venture a profit is jointly sought. It is in a sense a partnership for a limited purpose, and it has long been recognized that the legal consequences of a joint venture are equivalent to those of a partnership." *Gramercy Equities Corp. v. Dumont*, 72 N.Y.2d 560, 565 (1988) (citing *Pedersen v. Manitowoc Co.*, 25 N.Y.2d 412, 419 (1969)) (internal quotation omitted). However, merely calling a business arrangement a "joint venture" does not automatically create such a relationship. *See USAirways Grp., Inc. v. British Airways PLC*, 989 F. Supp. 482, 493 (S.D.N.Y. 1997). Rather, the following five elements must be present to form a joint venture:

> (1) two or more persons must enter into a specific agreement to carry on an enterprise for profit; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge, or effort; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for the sharing of both profits and losses.

*Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 67-68 (2d Cir. 2003) (quoting *Itel Containers Int'l Corp. v. Atlanttrafix Express Serv. Ltd.*, 909 F.2d 698, 701 (2d Cir. 1990)). "The absence of any one of the elements is fatal to the establishment of a joint venture." *US Airways Grp., Inc.*, 989 F. Supp. at 492-93. Significantly, "[a]n indispensible essential of a contract of partnership or joint venture . . . is a mutual promise or undertaking of the parties to share in the profits of the business and to the burden of making good the losses."[1] *Steinbeck v. Gerosa*, 4 N.Y.2d 302, 317

---

[1] The Court recognizes, as stated in *Cosy Goos Hellas v. Cosy Goose USA, LTD.*, 581 F. Supp. 2d 606, 620-21 (S.D.N.Y. 2008), that a "discrete minority of New York cases . . . appear to

(1958); *see also Growblox Scis., Inc. v. GCM Admin. Servs., LLC*, No. 14-CV-2280, 2015 WL

3504208, *7 (S.D.N.Y. June 2, 2015) (quoting *Ronis v. Carmine's Broadway Feast, Inc.*, No. 10

Civ. 3355, 2012 WL 3929818, *5 (S.D.N.Y. Sept. 7, 2012)) ("Certain factors are more important

than others, particularly the 'indispensable' quality of a partnership consisting of 'a mutual

promise or undertaking of the parties to share in the profits of the business *and submit to the*

*burden of making good the losses*'") (emphasis in original).

Westcode initially argues that the use of the term "joint venture" in several places of the

JVAs establishes that the parties, in fact, created a joint venture. It further contends that

Mitsubishi "acknowledges that the relationship between it and Westcode was that of partners"

based on Mr. Takase's declaration that "[Mitsubishi] decided to partner with Westcode . . . ." Dkt.

No. 47-1 at 11 n.3 (quoting Dkt. No. 30-2 at ¶ 6). These statements addressing the parties'

relationship as a joint venture or a partnership are not dispositive as the mere phrasing of

agreements cannot create such a business relationship. *See US Airways Grp., Inc.*, 989 F. Supp.

at 493. Westcode cites several cases that it contends support its argument that the use of the joint

venture terminology in an agreement creates a joint venture. *See* Dkt. No. 60 at 5. While these

cases indicate that the usage of particular language is evidence of intent to create a joint venture,

the agreements between the parties in each case cited by Westcode also satisfied the five essential

elements listed above, including the agreement to share profits and losses. *See In re Roxy Roller*

*Rink Joint Venture*, 67 B.R. 474, 476 (Bankr. S.D.N.Y. 1985) ("[E]ach party shall be liable for,

---

liberalize the elements of a joint venture" by holding that "a joint venture may be established
when a possible co-venturer only stands to lose the value of his or her services contributed to the
joint venture[,]" rather than requiring an agreement to share the overall losses of the joint venture.
The Court agrees with *Cosy Goos Hellas* that these minority decision are not in accord with the
elements of a joint venture under New York law, which explicitly requires an agreement to share
profits and losses. *Id.* (noting that these minority decisions "have come under heavy scrutiny and
derision").

and agrees to pay into the Venture promptly when due, his ownership interest percentage share of all costs and expensees of whatsoever kind or nature incurred by the Venture . . . ."); *ESI, Inc. v. Coastal Power Prod. Co.*, 13 F. Supp. 2d 495, 499 (S.D.N.Y. 1998) ("The contract also suggests that the parties intended to share the profits and losses of the Project").

Mitsubishi does not seriously contest that the first four requirements to form a joint venture are present in this case, and argues solely that the parties did not agree to share profits and losses. *See* Dkt. No. 59 at 12-16. Westcode's reply presents three grounds for it claims there was an agreement to share profits and losses. First, that the "final account" provision of the JVAs indicates the parties were to "true up" the profits and losses through an accounting at the end of the projects. Second, that the parties had a joint bank account for the joint venture. Third, that the indemnification provisions establish the intent to share losses. *See* Dkt. No. 60 at 4-7.

Article 19 of the JVA states as follows:

> Where provision is made in this AGREEMENT for the payment of sums by the MEMBERS in proportion to their respective portions of the CONTRACT PRICE, payment shall be made on the basis of the CONTRACT PRICE then regarded as current at the time of payment in question. The MEMBERS agree that after completion of the WORKS the final CONTRACT PRICE shall be calculated and they shall make such adjustment of payment between themselves (including to reflect interest) as may be necessary to ensure that payment hereunder reflect their respective portions of the CONTRACT PRICE as finally determined.

Dkt. No. 38-3 at 13.[2] Contrary to Westcode's assertions, this final account provision does not stand for the proposition that the parties agreed to share any losses that they may incur on the Projects. Rather, when read in conjunction with numerous other provisions of the JVAs, it is

---

[2] All citations to the JVA in this section are for the R160 project, as that is the project that gave rise to the obligations present in the MOU. Unless otherwise noted, each of the JVAs for the other projects contain the same, or substantially similar provisions as cited herein.

clear that the purpose of the JVA and the final account clause was to require each Westcode and Mitsubishi to be independently responsible for their respective portions of the Projects, and to be solely responsible for any losses incurred on their share of the work.

Article 3.11 of the JVA states that "[e]ach MEMBER shall individually assume all risks relating to payment by the CUSTOMER of the portion of the CONTRACT PRICE for its particular SCOPE OF WORK including but not limited to the risk of delayed payment, loss of payment or any other loss or damage relating thereto." *Id.* at 5. Article 2.5 explicitly states that "Nothing in this AGREEMENT, . . . shall entitle any of the MEMBERS to pledge the credit or incur any liabilities or obligations binding upon any other MEMBER except insofar as may have been expressly agreed." *Id.* at 4. Rather than creating a liability for any loss incurred by the other party, Article 3.11 expressly provides that "[e]ach MEMBER shall individually assume all risks relating to payment by the CUSTOMER of the portion of the CONTRACT PRICE for its particular SCOPE OF WORK including but not limited to the risk of delayed payment, loss of payment or any other loss or damage relating thereto." *Id.* at 5. Article 7.3 states that "[i]f any part of the WORKS performed by a MEMER [sic] within its SCOPE OF WORK shall become defective and require to be dismantled, replaced, modified or repaired in any way in order to comply with the terms and conditions of the CONTRACT, then that MEMBER shall be responsible for and bear the cost of dismantling, replacement, modification or repair as may be required." *Id.* at 7-8. Article 7.10 states that "No MEMBER shall be liable to [the] other MEMBER under this AGREEMENT for any claim for loss of profits or any other consequential or indirect damage suffered by that other MEMBER . . . ." *Id.* at 9. The Court finds that these JVA provisions provide evidence that each party was expected to contribute to the Projects only on their respective portions, and that they would only be liable for the losses incurred on those

portions as well. *See Cosy Goose Hellas*, 581 F. Supp. 2d at 620-21 (citing *Dinaco, Inc.*, 346 F.3d at 68) (other citations omitted) ("[A] putative joint venturer who only stands to lose the value of [its] services rendered in connection with the venture does not submit [itself] to the liabilities and losses of the venture and thus is not considered a joint venturer"). Thus, each party could not incur losses caused by the other party's actions under the business arrangement established by the JVA.

Further, the indemnification clause of the JVA provides that neither party shall be liable for any improper actions taken by the other party. The indemnification provision of the JVA states as follows:

> Each MEMBER shall be liable to the other MEMBER for and shall indemnify and hold harmless the other MEMBER against any claim made by the CUSTOMERS or any other third party for injury, damage, loss or expense to the extent that such injury, damage, loss or expense is attributable to:
>
> (a)     any breach or non performance by the indemnifying MEMBER of this agreement or the CONTRACT; or
>
> (b)     negligence or default (or other act or omission giving rise to a cause of action by the CUSTOMERS or any other third party under any relevant law) on the part of [the] indemnifying MEMBER or its employees, agents or subcontractors in the course of or arising out of the PROJECT.

*Id.* at 8. This clause does not mention sharing of profits or losses. Rather, it provides evidence to Mitsubishi's argument that the parties were treated separately in conducting business on the Projects, and either party would not be liable for the actions of the other party. *See Cosy Goose Hellas*, 581 F. Supp. 2d at 621 (quoting *Weinreich v. Sandhaus*, No. 83 CIV. 3966, 1989 WL 130641, *3-4 (July 24, 1989) ("also relevant to the inquiry of whether a party 'risked loss' is whether [it] also agreed to assume personal responsibilities for the potential legal liabilities of the

enterprise").  Accordingly, neither the final account nor the indemnification clause of the JVA, when read in conjunction with the rest of the agreement, provide evidence that the parties agreed to share profits and losses.

While a joint bank account may, in some cases, be evidence that a joint venture exists, *see Burde v. Comm'r of Internal Revenue*, 352 F.2d 995, 1002 (2d Cir. 1965), the bank account in this case was set up solely to receive payments from customers, and was not otherwise for the joint use of the parties.  The parties joint bank account was to be used "solely for the receipt of the payments by [the parties] from the CUSTOMERS and the transfer of them to each MEMBER." Dkt. No. 38-3 at 4.  Moreover, the bank account "shall not be used for making any payment to the third parties, creating mortgage, or any other purposes whatsoever than the purposes mentioned herein."  *Id.*  Thus, far from being a means for the parties to equally share in the expenditures and losses incurred while working on the Projects, the joint bank account was set up for the sole purpose of receiving payment from the customers.  Rather than keeping the payments in the bank account after payment had been received for the use of either party, the JVA required that "each MEMBER's respective portion of the payments [deposited in the joint account] shall be transferred, immediately after the receipt of the payments, to the bank account of each MEMBER."  *Id.*  This method for receipt of payment from customers does not establish an agreement between the parties to share losses since neither party had the authority to use the joint account to create any liabilities attributable to the others' business.

Accordingly, Westcode has failed to establish that the parties agreements in the JVAs satisfied each of the requirements under New York law to create a joint venture or partnership. As such, a formal accounting is not a prerequisite for one party bringing an action at law against the other, and Westcode's motion for judgment on the pleading is denied.  The Court will not

consider the remaining arguments raised by either party in this motion as they are either irrelevant absent a finding that the parties formed a joint venture, or are addressed by later motions decided herein.

**B.      Motion to Dismiss Westcode's Counterclaims**

*1. Standard of Review*

The same standard of review applies to a Rule 12(b)(6) motion to dismiss as a Rule 12(c) motion for judgment on the pleadings. *See Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). Accordingly, the Court will apply the same standard as previously stated in *supra*, Part III(A)(I).

*2. Rule 8 Pleading Requirements*

Mitsubishi contends that Westcode's first counterclaim must be dismissed for failure to provide Mitsubishi with "fair notice of the claims against [it]." Dkt. No. 43-1 at 6. Specifically, Mitsubishi argues that Westcode has failed to sufficiently allege its breach of fiduciary duty, misrepresentation, and fraud counterclaims. *See* Dkt. No. 55 at 5-6.

"Counterclaims, like claims, are subject to Rule 8(a)'s pleading requirements." *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, 531 F. Supp. 2d 620, 623 (S.D.N.Y. 2008). Rule 8 requires "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation omitted). However, Rule 9(b) provides "an exception to the generally liberal scope of pleadings allowed by Rule 8," and "requires that '[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity . . . .'" *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986)

(citation omitted).  Specifically, Rule 9 requires a pleading to state "(1) the details of the time and place of the alleged misrepresentation; (2) the identity of the speaker; and (3) the content of the misrepresentations."  *United Republic Ins. Co. v. Chase Manhattan Bank*, 168 F. Supp. 2d 8, 16 (N.D.N.Y. 2001) (citing *id.*) (other citation omitted).

While Westcode's answer does not assert a separate claim for fraud or misrepresentation, to the extent that its second counterclaim for breach of implied covenant of good faith and fair dealing sound in fraud, it pleads sufficient factual allegations to support such a claim.  *See Sheppard v. Manhattan Club Timeshare Ass'n, Inc.*, No. 11 Civ. 4362, 2012 WL 1890388, *8 (S.D.N.Y. May 23, 2012) (citing *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191-92 (2d Cir. 2001)) (other citation omitted) ("When a breach of fiduciary duty claim is premised upon fraudulent misconduct, Rule 9(b) applies").  Westcode's answer alleges that Mitsubishi "intentionally overstated its costs thereby wrongfully inflating its share of the revenue split."  Dkt. No. 38 at ¶ 47.  Moreover, "Mitsubishi was, at all times, aware" that "Westcode's costs were estimated on the basis of a design that was not ultimately used by Mitsubishi[, and] Mitsubishi's final design was substantially more expensive for Westcode to build" than the original estimates.  *Id.* at ¶¶ 48, 49.  Westcode further asserts that Mitsubishi "overstat[ed] its costs and/or var[ied] the product designs, in connection with the Joint Venture's determination of revenue splits."  *Id.* at ¶ 54.  In support of its claims for offset and an accounting, Westcode contends that it "incurred . . . extended warranty claims because Mitsubishi failed to provide bench testing units under the R160 and R142 projects."  *Id.* at ¶ 61.

Westcode alleges that Mitsubishi intentionally misstated its costs for the projects, which caused Westcode to fall behind on payments due under the joint venture projects.  *Id.* at ¶¶ 47, 49.  Mitsubishi allegedly provided a cost estimate based on a less expensive design that it knew

Westcode was not going to use in its projects, such that Westcode's share of expenses for the project was substantially underestimated.  *Id.* at ¶ 48.  The Court finds that this pleading is sufficiently particular to support a claim sounding in fraud because it pleads intentional conduct on Mitsubishi's behalf with the specific action of misstating costs for the designs of projects.  To the extent that either of Westcode's counterclaims sound in fraud, Mitsubishi's motion to dismiss on this ground is denied.

### 3. No Setoff Clause

Article 5 of the MOU states as follows:

> In the event of any claim being made by Westcode against [Mitsubishi], Westcode shall not be entitled to withhold any amount due under this MOU or any individual contract or to set off the amount of such claim against any amount due under this MOU or any individual contract.  All such claims shall be settled separately, in which case Westcode shall show [Mitsubishi] evidential documents for such claims as a proof, failing which [Mitsubishi] shall have no liability for such claims by Westcode.

Dkt. No. 1-1 at 3.

Mitsubishi argues that Westcode has "expressly waived its right to assert its accounting counterclaim, or any other claim designed to achieve a setoff" by assenting to this clause in the MOU.  Dkt. No. 43-1 at 7.  Westcode's position is that the no setoff clause was not a waiver of its right to assert a counterclaim in a legal action after the completion of the projects, but rather prohibited Westcode from setting-off any amounts as they became due under the MOU during the progress of the other projects.  *See* Dkt. No. 53 at 9-13.  In light of these conflicting interpretations, Westcode argues that the no setoff clause must be read in connection with the parties previous JVA agreements.  *Id.*

Mitsubishi is correct that New York courts enforce explicit contractual waivers of the right to assert a setoff counterclaim or affirmative defense, unless that counterclaim sounds in fraud. *See, e.g.*, *Fleet Bank v. Petri Mech. Co.*, 664 N.Y.S.2d 462, 462-63 (2d Dep't 1997). However, the cases Mitsubishi relies upon either did not state the language of the waiver, or have much more explicit waiver provisions than contained in the MOU. *See id.* at 462 ("[T]he guarantors were waiving 'the right to interpose any defense * * * [and] any set-off or counterclaim of any nature or description'"); *Mishal v. Fiduciary Holdings, LLC*, 971 N.Y.S.2d 334, 335 (2d Dep't 2013) ("Fiduciary validly 'waive[d] the right to interpose any defense, setoff, counterclaim or crossclaim of any nature or description'"); *Louis de Roll Iron Works, Ltd. v. Webb & Knapp, Inc.*, 36 Misc. 2d 216, 217 (Sup. Ct. Bronx Cnty. 1962) ("The customer will not be allowed to set off his commitments to us with any counterclaims"). The Court finds that the no setoff clause in the MOU, which does not contain the words counterclaim, defense, waiver, or release, is not a clear waiver of Westcode's right to assert counterclaims or defenses and, as such, requires further clarification.

A contractual term or provision is ambiguous "where a natural and reasonable reading of its language allows for two or more possible meanings." *Roberts v. Consol. Rail Corp.*, 893 F.2d 21, 24 (2d Cir. 1989); *see also Seiden Assocs., Inc. v. ANC Holdings*, 959 F.2d 425, 428 (2d Cir. 1992) (defining "ambiguous language as that which is '"capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business"'") (quotation omitted). "Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties' intended a meaning different than that expressed in the agreement and, therefore,

extrinsic evidence 'may be considered only if the agreement is ambiguous.'" *Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011) (quotation and other citations omitted).  If a portion of a contract is deemed ambiguous, "the court should look to the contract as a whole and the parties' conduct, as well as any evidence of surrounding facts and relevant circumstances, industry custom and practice, and course of dealing" to determine the parties intent in drafting the ambiguous terms. *Glassalum Int'l Corp. v. Albany Ins. Co.*, No. 03 Civ. 9166, 2005 WL 1214333, *7 (S.D.N.Y. May 23, 2005) (citing *Bourne v. Walt Disney Co.*, 68 F.3d 621, 627-29 (2d Cir. 1995)) (other citations omitted).  "[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and [is to] be avoided if possible." *CDR-Wantagh, Inc. v. Shell Oil Co.*, No. 07-CV-4497, 2011 WL 6371582, *10 (E.D.N.Y. Dec. 20, 2011) (quoting *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992)).

Far from being an explicit waiver of Westcode's rights to assert a counterclaim or affirmative defense, the no setoff clause does not contain the words counterclaim, defense, waiver, or release.  Moreover, the two sentences in Article 5 appear to be at odds with one another and the provision is unclear as it applies to litigation.  First, the clause starts with the introduction, "[i]n the event that any claim being made by Westcode against [Mitsubishi] . . . ." Dkt. No. 1-1 at 3.  This provision does not make clear whether it contemplated "claim" to mean a cause of action or counterclaim in a legal proceeding, as Mitsubishi contends, *see* Dkt. No. 43-1 at 6, or as an "interim accounting function to keep payments and claims separate until the end of the project[,]" as Westcode contends, *see* Dkt. No. 53 at 13.  Second, the internal inconsistencies of the clause, first stating that Westcode shall not be entitled to withhold any amount due for a claim under the MOU, and in the second sentence stating that "[a]ll such claims shall be settled separately," creates an ambiguity as to whether Westcode unequivocally waived its right to assert

15

a setoff counterclaim, or whether it was required to wait until the projects were finalized so that a proper accounting could be completed and the claims settled together.

In resolving this ambiguity, the Court is guided by the parties' previous agreements. *See JA Apparel Corp. v. Abbound*, 682 F. Supp. 2d 294, 303 (S.D.N.Y. 2010) (citing *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044, 1048 (2d Cir. 1989)) (other citations omitted). As noted in the July 11 Order, the obligations under the MOU generally arose out of payments due on the R160 project. *See* Dkt. No. 74. It is significant that each of the JVAs contained a final account provision. As noted earlier, the final account provision provides as follows:

> Where provision is made in this AGREEMENT for the payment of sums by the MEMBERS in proportion to their respective portions of the CONTRACT PRICE, payment shall be made on the basis of the CONTRACT PRICE then regarded as current at the time of payment in question. The MEMBERS agree that after completion of the WORKS the final CONTRACT PRICE shall be calculated and they shall make such adjustment of payment between themselves (including to reflect interest) as may be necessary to ensure that payment hereunder reflect their respective portions of the CONTRACT PRICE as finally determined.

Dkt. No. 38-3 at 13 (R160); Dkt. No. 38-2 at 16 (R142A); Dkt. No. 38-4 at 12 (PATH). This final accounting provision in the JVAs indicates the parties' intent to establish a set payment schedule during the course of the projects, while allowing these payments to be reevaluated to represent actual costs after the projects had been completed. Thus, the accounting provisions in the JVAs are consistent with Westcode's asserted interpretation that the first sentence of the no setoff clause prevented Westcode from claiming setoffs at the time when payments came due on the MOU during the course of the projects, and the second sentence allows for these claims to be resolved at a later date after completion of the projects upon a proper factual showing.

Moreover, Mitsubishi's reply states that it does not contend "that Westcode has no ability to assert any claims against [Mitsubishi], but only that the MOU prohibits Westcode from

16

asserting any counterclaims or defenses to offset or diminish its liability under the MOU in an action under that contract . . . [and] Westcode must bring those claims separately from the instant action, and only after Westcode has shown [Mitsubishi] the documentation supporting those claims." Dkt. No. 55 at 9-10. This reasoning is flawed for several reasons. First, the no setoff clause does not mention counterclaims or defenses, such that Mitsubishi's argument that Westcode only waived its setoff rights as to counterclaims or defenses, while acknowledging that they may bring the same claims in separate actions, is irreconcilable. Further, given Mitsubishi's concession that Westcode has the right to bring an action to recover for a setoff at some point, it seems unlikely that the parties would have intended to require litigation of two separate, yet completely related, cases to resolve their disputes. Rather, the clause permitting Westcode to recover for such setoff claims in a separate action indicates that this clause was meant to bar Westcode from seeking a setoff of any payments as they became due, and not to bar Westcode from making any such claim after the projects were all completed and while the parties were already in court resolving their disputes. It is also inconceivable that Mitsubishi could limit Westcode's access to court intervention to resolve disputes under this agreement only upon approval of Westcode's proposed evidence supporting any such claim. It is the Court's, not the opposing party's, role to stand as gatekeeper to determine whether a party has provided sufficient factual evidence to move forward with an action at law to recover under a contract dispute.

To the extent that Mitsubishi argues that the instant proceeding is inconsistent with the final portion of Article 5, the merits of Westcode's setoff counterclaim will ultimately be settled "separately" by the Court if they can produce the evidence that shows they are entitled to such relief. The MOU does not state that any setoff claims must be settled in a different court proceeding or at a different time than the underlying action, simply that it be settled "separately,"

which is what the Court will do by deciding the merits of Mitsubishi's breach of contract claim separately from the merits of Westcode's counterclaims. Accordingly, the Court finds that the no setoff clause in Article 5 of the MOU does not bar Westcode's counterclaims in this action, and Mitsubishi's motion is denied on this ground.

### 4. Westcode's Right to an Accounting

Westcode's first counterclaim seeks an accounting based the "Final Account" provisions in the JVAs. *See* Dkt. No. 38 at ¶¶ 37-63. This counterclaim can be read as either a request for the equitable relief of an accounting, or for a contractual claim for accounts stated. Mitsubishi argues that Westcode has failed to state a claim under either interpretation. *See* Dkt. No. 43-1 at 8.

### a. Account Stated

An account stated is "an 'agreement between the parties to an account based upon prior transactions between them with respect to the correctness of the separate items composing the account and the balance due, if any, in favor of one party or another.'" *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 541 (Bankr. S.D.N.Y. 2000) (citations omitted). "A cause of action to recover on an account stated 'sound[s] in breach of contract . . . .'" *Racwell Const., LLC v. Manfredi*, 61 A.D.3d 731, 734 (2d Dep't 2009) (quoting *Zendler Constr. Co., Inc. v. First Adj. Group, Inc.*, 59 A.D.3d 439, 441 (2d Dep't 2009)). An essential element to survive a motion to dismiss a claim for account stated is pleading the amount due under the account. *Dig. Ctr., S.L. v. Apple Indus., Inc.*, 94 A.D.3d 571, 572-73 (1st Dep't 2012). Further, a plaintiff must plead "that the parties came to 'an agreement with respect to the amount of the balance due . . . .'" *Raytone Plumbing Specialities, Inc. v. Sano Const. Corp.*, 92 A.D.3d 855, 856 (2d Dep't 2012) (quoting *Cameron Eng'g & Assoc., LLP v. JMS Architect & Planner, P.C.*, 75 A.D.3d 488, 489 (2d Dep't

2010)).  Thus, to state a claim for an account stated, "the plaintiff must plead that: '(1) an account was presented; (2) it was accepted as correct; and (3) debtor promised to pay the amount stated.'" *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009) (quotation and citations omitted).

Here, apart from stating that the parties were both subject to the accounting clause contained in the JVAs, Westcode has failed to allege any other required elements to plead a claim for accounts stated.  Westcode has not pled that it presented Mitsubishi with a proposed amount due on the account, that Mitsubishi accepted this amount as true, or that Mitsubishi promised to pay any amount to Westcode for the alleged disparities in the amounts paid under the JVAs.  Westcode does not seriously contend that it has satisfied the pleading requirements for an account stated, instead focusing its arguments in its opposition to the instant motion on its equitable right to an accounting.  Accordingly, to the extent that Westcode's first counterclaim asserts a claim for accounts stated, Mitsubishi's motion to dismiss is granted on this ground.

### b. Equitable Accounting

To state a claim for accounting, a plaintiff must plead "(1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal."  *IMG Fragrance Grands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009) (quotation omitted).

As noted earlier, the parties relationship did not amount to a formal joint venture or partnership as defined by New York law so as to require an accounting prior to bringing suit.  *See supra*, Part III(A)(2).  Nonetheless, an accounting may be available as its own cause of action if the parties have a separate fiduciary relationship.  *See, e.g.*, *Mexican Hass Avocado Imps. Ass'n v.*

*Preston/Tully Grp. Inc.*, 838 F. Supp. 2d 89, 97 (E.D.N.Y. 2012) (quoting *Stevens v. St. Joseph's Hosp.*, 52 A.D.2d 722, 723, 381 N.Y.S.2d 927, 929 (4th Dep't 1976)) ("The fiduciary relationship necessary to obtain an accounting is created by the plaintiff entrusting to the defendant some money or property with respect to which defendant is bound to reveal his dealings").  Here, the Court need not determine whether the parties interactions rose to the level of a fiduciary relationship, as Westcode clearly has an adequate legal remedy at law.  As noted above, Westcode has a right to assert its setoff claim in defense of what it owes under the MOU.  As such, any information that Westcode seeks to obtain through an accounting would be available to it through discovery for its offset and recoupment counterclaim and defenses.  *See Banks v. Corr. Servs. Corp.*, 475 F. Supp. 2d 189, 202 (E.D.N.Y. 2007) ("Because Plaintiff has sought money damages in his breach of contract claim, and because discovery as to the measure of damages would be available to him . . . on that claim, he can obtain all the information he seeks in his existing claim at law.  Accordingly, no purpose would be served by treating Plaintiff's equitable accounting claim as an additional, and duplicative, action at law") (footnote omitted).  Significantly, Westcode's first counterclaim seeks an accounting "so it can ascertain [t]he appropriate contractual adjustments, offsets and/or recoupments, and payment over to Westcode for any amounts owed." Dkt. No. 38 at ¶ 63.  Thus, Westcode's request for accounting is solely for the purpose of discovering information relevant to its offset and recoupment claims.  Accordingly, Mitsubishi's motion is granted on this ground and Westcode's first counterclaim for an accounting is dismissed as it has an adequate remedy at law through its setoff and recoupment defenses.[3]

---

[3] The Court notes that Westcode's first counterclaim is dismissed only to the extent that it seeks an accounting.  To the extent that the first counterclaim asserts a claim for setoff and recoupment, those claims are not dismissed and Westcode may use the ordinary discovery procedures to establish such claims.

*5. Acquiescence and Estoppel*

Mitsubishi argues that Westcode is estopped from asserting its counterclaims due to its failure to bring an action for accounting at a previous point. As an initial matter, the Court notes that affirmative defenses may be raised by a Rule 12(b)(6) motion to dismiss "if the defense appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998).

The New York Court of Appeals defined estoppel by acquiescence as follows:

> Where a person wronged is silent under a duty to speak, or by an act or declaration recognizes the wrong as an existing and valid transaction, and in some degree, at least, gives it effect so as to benefit himself or so as to affect the rights or relations created by it between the wrongdoer and a third person, he acquiesces in and assents to it and is equitably estopped from impeaching it.

*Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.2d 556, 564 (1959) (quoting *Rothschild v. Title Guar. & Trust Co.*, 204 N.Y. 458, 461 (1912)); *see also In re Ellison Assocs.*, 63 B.R. 756, 765 (S.D.N.Y. 1983) ("[T]he estoppel by silence doctrine . . . requires (1) the duty to speak, (2) an opportunity to speak, and (3) an injury to another party as a result of the failure to speak") (citations omitted).

Here, it is undisputed that Westcode did not seek an accounting or assert a claim for setoff prior to the instant proceeding. Mitsubishi contends that this failure amounts to estoppel by acquiescence or silence since the "actionable conduct began as early as November 1997, and apparently continued for years . . . ." Dkt. No. 43-1 at 12. Mitsubishi's argument is misplaced given that the accounting provisions in the JVAs do not arise until "after completion of the work[]" on the projects. Dkt. No. 38-3 at 13. While Westcode asserts in its answer that "[t]he component delivery portion of all of the Joint Ventures' projects have been completed[,]" it is

unclear when this work was completed, and, accordingly, when Westcode's rights arose. Thus, Westcode undoubtedly had an opportunity to assert its accounting claim prior to the instant proceeding. Regardless, Mitsubishi has failed to allege that Westcode had a duty to assert its rights prior to this point and, significantly, has not alleged any injury caused by Westcode's waiting to assert its arguments as counterclaims in the instant action rather than raising them earlier in an independent suit. *See In re Vebeliunas*, 252 B.R. 878, 888-89 (Bankr. S.D.N.Y. 2000) (noting that "[t]he doctrine of equitable estoppel [by silence] should be applied cautiously and used only when grounds for its application are clearly established") (quotation omitted). Accordingly, Mitsubishi's motion is denied on this ground and Westcode is not estopped from asserting its counterclaims.

### *6. Breach of the Duty of Good Faith*

Lastly, Mitsubishi argues that Westcode's second counterclaim for the breach of the implied covenant of good faith and fair dealing should be dismissed as duplicative of its other claims. *See* Dkt. No. 43-1 at 13-15.

"Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract. New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)).

Here, Westcode's second counterclaim for breach of implied covenant of good faith and fair dealing rests entirely on the allegations underlying its first counterclaim for setoff, recoupment, and accounting. *See* Dkt. No. 38 at ¶¶ 64-67. Westcode's answer contains three

specific allegations that could potentially give rise to its second counterclaim: (1) "Mitsubishi intentionally overstated its costs thereby wrongfully inflating its share of the revenue split," *id.* at ¶ 47, (2) Mitsubishi "was, at all times, aware" that "Westcode's costs were estimated on the basis of a design that was not ultimately used by Mitsubishi," *id.* at ¶¶ 48, 49, and (3) "Westcode incurred . . . extended warranty claims because Mitsubishi failed to provide bench testing units under the R160 and R142 projects," *id.* at ¶ 61.  The Court finds that these allegations giving rise to Westcode's claim for breach of the obligation of good faith and fair dealing are recoverable under its claim for offset based on Mitsubishi's breach of the JVAs.  The cases cited in Westcode's opposition do not negate the clearly established principle that New York law does not recognize duplicate arguments for breach of the implied covenant of good faith and fair dealing based on the same facts in a previously pled claim to recover under other express provisions of a contract. Accordingly, Mitsubishi's motion to dismiss is granted on this ground and Westcode's second counterclaim is dismissed.

**C.      Mitsubishi's Motion for Summary Judgment**

**        *1. Standard of Review***

**                *a. Summary Judgment***

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried."  *Id.* at 36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading.  *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting FED. R. CIV. P. 56(c), (e)). Further, "disputes over irrelevant facts must not be allowed to obscure the lack of a material dispute . . . ." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 923 (2d Cir. 1985). In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted).

### b. Rule 56(d)

The Second Circuit has stated as follows:

> [a] party resisting summary judgment on the ground that it needs additional discovery in order to defeat the motion must submit an affidavit pursuant to Federal Rule of Civil Procedure 56(d) (formerly Rule 56(f)), showing: "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts."

*Lunts v. Rochester City Sch. Dist.*, 515 Fed. Appx. 11, 13 (2d Cir. 2013) (quoting *Meloff v. N.Y. Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995)). Pursuant to Rule 56(d), if a party opposing a motion for summary judgment "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." FED. R. CIV. P. 56(d).

Rule 56(d) "is a safeguard against premature grants of summary judgment and should be applied with a spirit of liberality." *Holmes v. Lorch*, 329 F. Supp. 2d 516, 529 (S.D.N.Y. 2004) (quotation omitted); *see also Delphi–Delco Elecs. Sys. v. M/V NEDLLOYD EUROPA*, 324 F.

Supp. 2d 403, 417–18 (S.D.N.Y. 2004).  This is especially true where a party has not had an opportunity to conduct full discovery.  The nonmoving party should not be "railroaded" into his offer of proof in opposition to summary judgment.  *Delphi–Delco Elecs. Sys.*, 324 F. Supp. 2d at 421 (citation omitted).  The nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment.  *See id.* (citation omitted); *see also Anderson*, 477 U.S. at 250.  Since Rule 56(d) "is an important safeguard against improvident or premature motions for summary judgment, courts generally avoid overly technical rulings under this subdivision and apply it with a spirit of liberality." *Delphi–Delco Elecs. Sys.*, 324 F. Supp. 2d at 417-18 (citations omitted).  "Thus, while failure to file an affidavit meeting the foregoing requirements is sufficient grounds to reject a claim that the opportunity for discovery was inadequate, it is not automatically fatal to such a request." *Id.* (citations omitted).

There is a "critical distinction . . . between cases where a litigant opposing a motion for summary judgment requests a stay of that motion to conduct *additional* discovery and cases where that same litigant opposes a motion for summary judgment on the ground that it is entitled to an opportunity to *commence* discovery with respect to Plaintiff's claims and its counterclaims." *Crystalline H2O, Inc. v. Orminski*, 105 F. Supp. 2d 3, 6–7 (N.D.N.Y. 2000) (emphasis in original).  The Second Circuit has clarified that summary judgment should only be granted if "*after discovery*, the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Miller v. Wolpoff & Abramson*, L.L.P., 321 F.3d 292, 303–04 (2d Cir. 2003) (quoting *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000)) (internal quotation marks omitted) (alterations

in original).  Only in the "rarest of cases," therefore, may summary judgment be granted against a party who has not been afforded the opportunity to conduct discovery.  *Id.*

### 2. Mitsubishi's Motion

#### a. Relevant Background

The terms of the MOU requires Westcode to pay Mitsubishi a total of $14,869,967.06. Dkt. No. 44-1 at ¶ 3.  The payment schedule states that Westcode was to make an initial payment of $279,090, then 17 monthly payments of $225,000, and then, beginning in May of 2010, six monthly payments of $1,794,311.86 (the "balloon payments").  *Id.* at ¶ 5.  It is undisputed that Westcode paid Mitsubishi $4,104,090.20 specifically under the MOU, which represents the initial payment and the 17 monthly payments.  Dkt. No. 49-5 at ¶ 47.

The following issues are in dispute.  Westcode, through its CEO Edward Widdowson, alleges that it was unaware of the final six balloon payments due under the MOU.  *See* Dkt. No. 44-2 at ¶ 27.  During the period from November, 2008 until August, 2010, Westcode paid Mitsubishi approximately $34,629,028.66 for several joint venture projects and payments pursuant to the MOU.  *Id.* at ¶ 25; Dkt. No. 44-4 at 23-24.  Westcode contends that it mistakenly designated some of this amount paid as against other joint venture projects, rather than the MOU. Dkt. No. 44-2 at ¶ 26.  Mr. Widdowson stated that he became aware of the missed balloon payments when Atsushi Takase, Mitsubishi's general manager in its overseas marketing department, called to inquire about the missed payments in the spring of 2010.  *Id.* at ¶ 30.  Mr. Widdowson contends that he instructed Mr. Takase to reclassify certain of the payments made on other joint venture obligations to make up the remaining total due on the MOU for the missed balloon payments.  *Id.* at ¶ 31.  Allegedly, Mr. Takase never rejected this proposal, so Mr. Widdowson assumed that the reclassification had taken place and Westcode did not need to make

any further payments specifically on the MOU. *Id.* Mr. Widdowson contends that a former employee, Mike Hall, negotiated and entered into the MOU on Westcode's behalf. *Id.* at ¶ 27. Mr. Widdowson believes that further discovery will show that Mr. Hall "never gave anyone [at Westcode] the MOU and he only instructed the accounting department about the initial payment of $279,090.00 and the 17 monthly payments of $225,000.00." *Id.* Mr. Hall left Westcode in 2008. *Id.*

Mitsubishi, through affidavits from Mr. Takase, presents a far different recollection of the events giving rise to the instant disputes. Mr. Takase states that no one from Westcode, specifically not Mr. Widdowson, stated that they were "not aware of the MOU." Dkt. No. 49-3 at ¶ 10. Further, Mr. Takase states that he did not have any telephone conversation with Mr. Widdowson regarding reclassification of payments to the MOU, and that the only communications they had in 2010 were either by emails or in person at meetings. *Id.* at ¶¶ 11-12.

Mitsubishi supplied several emails between Mr. Widdowson and Mr. Takase discussing the issue of missed payments. On June 3, 2010, Mr. Takase wrote to Mr. Widdowson stating that "we are not able to confirm receiving loan payment $1,794,313 which should have wired the end of May. Please make sure your payment [sic] ASAP." *Id.* at 14. On June 4, 2010 Mr. Widdowson responded as follows:

> Dear Mr Takase,
> As you are aware, Westcode is experiencing very severe cash flow issues at the moment. They are caused by losses being suffered on MEPPI contracts, due to hold ups and engineering problems from MEPPI/[Mitsubishi], lack of payment by Kawasaki and MEPPI an[d] [Mitsubishi], therefore we have been compelled to suspend payments to [Mitsubishi]. Within days, if we do not receive gaskets from [Mitsubishi], who are currently arguing over price, we will be forced to shut down production on the Bombardier AMT line.
> I do not think anyone at [Mitsubishi] appreciates how serious this situation is, or you would not be "hounding" us for payment, it is

simple, if you do not pay us, we have nothing with which to pay
you.
[Mistubishi]/MEPPI currently owe Westcode $2,369146.70 and we
have received no payments that were agreed with MEPPI at our
meeting of May 14th.

*Id.* When asked again on June 25, 2010 about Westcode's projection for when it would repay the

missed May payment, Mr. Widdowson responded, "Currently, with the very poor cash flow we

are experiencing with KHI and Bombardier, we are unable to give you a projection." *Id.* at 17.

### b. Need for Discovery

Mitsubishi moved for summary judgment in the MOU Action on January 14, 2016. *See*

Dkt. No. 30. This was one day after the parties exchanged self-executing disclosures on January

13, prior to the initial pretrial conference with the Court and scheduling order on January 27, and

prior to Westcode filing its answer to the complaint. *See* Dkt. No. 44-2 at ¶ 43. Moreover,

Westcode contends that the case was "essentially stayed" pending the Eastern District of

Pennsylvania's decision to transfer/dismiss the related action. *Id.* at ¶ 44. Thus, Westcode had

"undertaken no discovery" prior to Mitsubishi's motion for summary judgment. *Id.* at ¶ 43.

Mr. Widdowson filed a declaration on Westcode's behalf that detailed the need for

discovery and the expectations for what it plans to obtain. Westcode intends to "obtain

documentation and other discovery from Mitsubishi and its vendors regarding its designs and

costs related to its contribution to the projects." *Id.* at ¶ 45. Further, Westcode intends to obtain

documentation as to "the field modifications required by Mitsubishi's defective designs as well as

the delivery date of bench test units by Mitsubishi and the warranty claims Westcode had to honor

because those units were delivered in an untimely manner[,]" and other documentation "regarding

payments and requests that payments be designated against the MOU as opposed to other Joint

Venture obligations." *Id.* at ¶¶ 46-47. Mr. Widdowson stated that this information is "relevant to

28

Westcode's claims regarding misrepresentation, breach of fiduciary duty, breach of good faith, accounting, recoupment, adjustment and setoff." *Id.* at ¶ 48. More specifically, Westcode believes that the "discovery will disclose that Mitsubishi's relative contributions to the JV's products was not 53% [as required by the JVAs], but was only approximately 40%." *Id.* at ¶ 15. Lastly, Westcode believes that discovery will show that its employee, Mike Hall, who was in charge of entering into the MOU, failed to inform Westcode of the terms of the MOU such that it was unaware of balloon payments due beginning in May of 2010. *Id.* at ¶¶ 25, 27.

Mitsubishi does not seriously contest that Westcode had not commenced discovery prior to the filling of the summary judgment motion. Rather, Mitsubishi argues that none of the proposed discovery in Mr. Widdowson's declaration is legally relevant to the breach of contract action, such that this is one of the "rare cases" where it is entitled to pre-discovery summary judgment. *See* Dkt. No. 49 at 5-6.

First, Mitsubishi contends that Westcode already has all of the evidence it needs to present its case because its initial disclosure states that the documents that it intends to rely upon consist of (1) the MOU, and (2) "Accounting records documenting payments." *See id.* at 6 (citing Dkt. No. 49-1 at 3). This argument is unpersuasive as a party is not bound to rely solely on what it states in its initial disclosure, and Westcode's disclosure specifically provides that "its investigation into the allegations in this action is continuing, and it therefore reserves the right to supplement these initial disclosures as the action proceeds." Dkt. No. 49-1 at 2. Thus, Westcode's failure to list the discovery information it now seeks in its initial disclosure is not a valid reason for the Court to not permit the commencement of discovery prior to ruling on the pending summary judgment motion.

Second, Mitsubishi argues that Westcode's request for discovery relating to the alleged misclassificaiton of payments to the JVAs rather than to the MOU fails for several reasons. Mitsubishi contends that "Westcode admits that it could not locate any law that would allow a debtor to force a creditor to 'reclassify' payments made on account of one debt to another after the fact." Dkt. No. 49 at 9. This argument misconstrues Westcode's position on this point. Rather than asking the Court to reclassify payments that Westcode made to Mitsubishi, Westcode's argument is that Mr. Takase engaged in material misrepresentations while talking with Mr. Widdowson by tacitly agreeing to reclassify payments allegedly made under the MOU and then failing to do so. This construction of Westcode's argument is consistent with its tenth affirmative defense that Mitsubishi prevented or frustrated Westcode's performance under the MOU. *See* Dkt. No. 38 at ¶ 36.

Next, Mitsubishi argues that Westcode's position that it was mistaken about the final six balloon payments is legally infirm. *See* Dkt. No. 49 at 9. The basis for this argument is that, regardless of Mr. Widdowson's actual knowledge of the terms of the MOU, Mr. Hall's knowledge of the terms of the MOU is attributed to Westcode because he entered into the MOU on Westcode's behalf as its president. Mitsubishi is correct that, generally, "the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals." *Id.* (quoting *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010)). However, even if this presumption applies to Mr. Hall's actions in this case such that Westcode is deemed to have knowledge of all the terms of the MOU, it would still not defeat Westcode's assertion that Mr. Takase made a material misrepresentation that Westcode need not make any more payments specifically under the MOU. Likewise, Mitsubishi's argument pursuant to New York's "discharge for value" rule, which does not allow a wire transfer to be reversed absent

specific conditions, is unavailing as the only consequence that this rule would have is that Westcode could not force the court to reclassify any wire payments after the fact. *See* Dkt. No. 49 at 10. This does not preclude Westcode's claims of misrepresentation, which require additional discovery to establish.

Next, Mitsubishi contends that additional discovery concerning Mr. Takase's alleged misrepresentation as to the MOU payments is irrelevant because the parties signed a document on August 9, 2010 "admitting that Westcode owed $10.8 million under the MOU." *Id.*; *see also* Dkt. No. 30-3 at 13-15. This agreement was allegedly the result of settlement negotiations between the parties. *See* Dkt. No. 44-2 at ¶¶ 41-42; Dkt. No. 49-2 at ¶¶ 7-16. Without addressing whether evidence from such settlement negotiations is admissible for summary judgment purpose, the Court finds that this alleged acknowledgment in August of 2010 that Westcode owed Mitsubishi $10.8 million does not necessarily preclude the possibility that Mr. Widdowson and Mr. Takase had a conversation in May, June, or July of 2010 discussing the reclassification of the previous payments. Moreover, Westcode argues that the alleged agreement that it owed $10.8 million, which was a copy of a series hand written from a whiteboard printout, was not an admission of indebtedness and was simply a snapshot of an ongoing series of negotiations and meetings that lasted over five years. *See* Dkt. No. 44-1 at ¶ 24. Accordingly, Mr. Takase's affidavit stating that the printout contains an admission that Westcode acknowledged its alleged indebtedness is in dispute. Without further factual development to determine the context and full purpose behind the August 9, 2010 meeting that produced the whiteboard printout, and the numerous negotiation meetings leading up to that point, the Court cannot rule at this point that no material question of fact exists that this printout was an admission that Westcode owed Mitsubishi $10.8 million.

Mitsubishi's last argument to discredit Westcode's request for discovery to develop its misrepresentation and payment defenses is that Mr. Widdowson's statement that he was mistaken about the balloon payments and that he talked with Mr. Takase to reclassify the alleged payments under the MOU are "so unreliable that [the] Court can and should reject it." *See* Dkt. No. 49 at 11-12.  To support this argument, Mitsubishi relies on emails between Mr. Takase and Mr. Widdowson that it submitted with its motion.  Specifically, Mitsubishi contends that on April 28, 2010, Mr. Widdowson sent Mr. Takase an email with an attached "Payment Status Summary" chart indicating that the "Balance Payment on Loan Agreement" was $10,990,877.  Dkt. No. 49-3 at 3 ¶ 14, 11.  Further, Mitsubishi cites to multiple emails from Mr. Widdowson that acknowledge Westcode's indebtedness without any mention of the fact that he asked Mr. Takase to reclassify payments made to the MOU.  *See id.* at 17-21.  While these emails cast some doubt on Mr. Widdowson's assertion that he was unaware of the balloon payments, they are not so reliable and complete as to discredit Mr. Widdowson's affidavit on this issue in its entirety.  Drawing all inferences in Westcode's favor, it is possible that Mr. Widdowson was initially mistaken about the balloon payments, and when he became aware of the outstanding debts, he began acknowledging that Westcode owed this amount.  Thus, the acknowledgment of indebtedness does not necessarily defeat Mr. Widdowson's assertion that Mr. Takase agreed to reclassify previous payments to the MOU.

In response to Westcode's counter-statement of material fact that Mr. Widdowson was assured by Mr. Takase that overpayments would be reclassified as payments against the MOU, Mitsubishi contends that "Westcode has not disclosed, identified, or produced any document relating to any telephone call between Mr. Widdowson and Mr. Takase in the Spring of 2010." Dkt. No. 49-5 at ¶ 49.  Mitsubishi's response to this statement of fact underscores the need for

additional discovery in this case. The evidence that Mitsubishi argues is lacking to support Westcode's claim is exactly the evidence that Westcode seeks to identify in its request to commence discovery. Moreover, Mr. Takase's statement that no one from Westcode ever informed him that they were unaware of the MOU does not dispute Mr. Widdowson's statement that he was unaware of the requirement to make the final six balloon payments. *See* Dkt. No. 49-3 at ¶ 10. Mr. Widdowson never claimed that he was unaware of the entire MOU, rather just the inclusion of the final six balloon payments. *See* Dkt. No. 44-2 at ¶ 27. Accordingly, while Mr. Takase's affidavits and the attached emails cast doubt upon Westcode's arguments, they are not so persuasive and all inclusive that the Court will discredit Mr. Widdowson's assertions as a matter of law and grant Mitsubishi summary judgment without any discovery being conducted in this case. It is precisely the purpose of discovery to provide the non-moving party with the opportunity to support its claims that, while appearing infirm in light of the opposition's arguments, may become legitimized through the discovery of additional evidence that contradicts the few selective documents that Mitsubishi has provided to support its arguments. Thus, the Court finds that Westcode's defenses of misrepresentation and payment are not discredited as a matter of law and it should be allowed the opportunity to commence discovery to develop these positions prior to summary judgment being granted against it.

A majority of Westcode's stated need for additional discovery is to support its counterclaims of setoff and recoupment. Mitsubishi argues that this proposed discovery is irrelevant due to the "no setoff" clause in the MOU. *See* Dkt. No. 49 at 13-14. Given the Court's decision on this issue that Westcode did not waive its right to assert a setoff counterclaim in this action, *see supra*, Part III(B)(3), the proposed discovery to support this counterclaim is relevant and necessary.

Mitsubishi argues that, even if some of the proposed discovery is relevant to Westcode's counterclaims, the Court should still grant partial summary judgment on Mitsubishi's breach of contract claim while allowing Westcode's counterclaims to proceed independently. *See id.* at 14. This argument is unpersuasive as Westcode has sufficiently stated a need for discovery to support its affirmative defenses as well as its counterclaims that are integrally intertwined with Mitsubishi's breach of contract claim. *See Crystalline H2O, Inc. v. Orminski*, 105 F. Supp. 2d 3, 9 (N.D.N.Y. 2000) (granting a Rule 56(d) motion to allow discovery on counterclaims and defenses when "the majority of Defendants' counterclaims [were] intertwined with the claims upon which Plaintiff seeks summary judgment"). Accordingly, Westcode satisfied its burden under Rule 56(d) and Mitsubishi's motion for summary judgment is denied as premature. Mitsubishi is free to renew its motion for summary judgment once Westcode has had an opportunity to conduct discovery on the relevant and material issues underlying its defenses and counterclaims and Mitsubishi's claim. The Court will not address the remaining arguments raised in Mitsubishi's motion.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Mitsubishi's motion for summary judgment (Dkt. No. 30) is **DENIED**; and the Court further

**ORDERS** that Mitsubishi's motion to dismiss Westcode's counterclaims (Dkt. No. 43) is **GRANTED in part** and **DENIED in part** as stated herein;[4] and the Court further

---

[4] Westcode's counterclaim seeking contractual adjustments, offsets and/or recoupments remains. Its counterclaims for an accounting and for the breach of the implied covenant of good

**ORDERS** that Westcode's motion for judgment on the pleadings (Dkt. No. 47) is

**DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on all parties in accordance with the Local rules.

**IT IS SO ORDERED.**

Dated:  July 12, 2016
         Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

faith and fair dealing are dismissed.